# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 15, 2025

Lyle W. Cayce
Clerk

———————

No. 23-30528

———————

EQHEALTH ADVISEWELL, INCORPORATED, *formerly known as* EQHEALTH SOLUTIONS, INCORPORATED,

*Plaintiff—Appellant*,

*versus*

HOMELAND INSURANCE COMPANY OF NEW YORK,

*Defendant—Appellee*.

_____

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:22-CV-50

_____

Before HIGGINSON, WILLETT, and OLDHAM, *Circuit Judges*.

STEPHEN A. HIGGINSON, *Circuit Judge*:[*]

The central question in this insurance appeal is whether there was coverage available to Appellant eQHealth AdviseWell, Inc., under its insurance policy with Appellee Homeland Insurance Company of New York. Because we determine that the insurance policy did not provide coverage for Appellant's claim, we AFFIRM.

———————————————————

[*] This opinion is not designated for publication. *See* 5TH CIR. R. 47.5.

No. 23-30528

## I.

Appellant eQHealth AdviseWell, f/k/a eQHealth Solutions, Inc. ("eQHealth"), is a Louisiana company that provides medical management services to Medicaid agencies, commercial healthcare payers, third-party administrators, and self-insured employer groups. One of eQHealth's clients was the State of Florida, Agency for Health Care Administration ("AHCA"). Under its contract with AHCA, eQHealth was responsible for administering the Medicaid program in Florida—which entailed, among other duties, conducting a "prior authorization review" to determine "medical necessity for various Medicaid services," including "Out-of-State Services."

Pursuant to this contractual duty to evaluate prior authorizations for out-of-state services, eQHealth determined that a Medicaid-eligible Florida patient, B.N., should be approved for out-of-state neurological rehabilitation,[1] and arranged for such treatment at Brookhaven Hospital ("Brookhaven"), a facility in Tulsa, Oklahoma. On August 17, 2018, AHCA entered into a contract with Brookhaven for 180 days of inpatient services for B.N. When those 180 days had nearly lapsed, Brookhaven requested authorization from eQHealth for another 180 days of inpatient services. At that point, however, eQHealth believed B.N. no longer met the medical necessity criteria, and denied the renewal request—but approved an additional 30 days of inpatient services to allow for a transition of B.N.'s care back to Florida.

For the services rendered to B.N., AHCA owed Brookhaven $262,500. Instead of paying that amount, AHCA argued that eQHealth had

---

[1] B.N. suffered from a "rare neurological disease," for which he had exhausted all in-state options, having been denied admission to "hundreds of facilities in Florida."

erred in approving B.N.'s care in the first instance, and eQHealth was therefore responsible for the payment. eQHealth began participating in negotiations with AHCA. On June 11, 2019, eQHealth received a draft settlement agreement from AHCA, which it signed.[2] After all parties had signed—on September 20, 2019—eQHealth paid Brookhaven $262,500.

eQHealth had an insurance policy—specifically, a "Managed Care Organizations Errors and Omissions Liability Policy" ("the Policy")—with Appellee Homeland Insurance Company of New York ("Homeland") for the period of January 16, 2019, to January 16, 2020. Generally, the Policy insured eQHealth for certain damages or claim expenses, including acts, errors, or omissions committed in the performance of a managed care activity, in excess of $50,000. Such damages or claim expenses did not include amounts payable under a contract or agreement.

For claims to be covered, the Policy required the claims to be first made against eQHealth during the policy period and reported to Homeland. eQHealth's reporting obligation specifically required, as relevant here, that Homeland be given written notice of claims. The Policy also set forth the process for providing notice of potential claims—that is, circumstances that would be "reasonably likely to give rise to a [c]laim."

Finally, the Policy contained various provisions that excluded coverage for certain types of claims—as relevant here, one that excluded coverage for any liability arising under any indemnification agreement, and another that excluded coverage for any cost arising from a settlement made without Homeland's prior consent.

---

[2] Details regarding the negotiations and draft settlement agreement are addressed more fully below. *See* Section III.B.

No. 23-30528

Beginning shortly after Brookhaven's request for an extension of B.N.'s out-of-state care was denied, eQHealth kept Homeland updated on the circumstances regarding B.N.'s case. There were three communications of note between eQHealth and Homeland: an initial notification sent to Homeland on April 30, 2019; an email sent to Homeland on June 17, 2019; and an email sent to Homeland on December 12, 2019. Homeland construed the first two communications as a notice of circumstances likely to give rise to a claim, but found that neither was actually a written notice of a claim. As for the December 12, 2019, communication, Homeland denied coverage on February 3, 2020, claiming that "no coverage [was] available" because, among other reasons, "no Claim against eQHealth was reported to Homeland."

eQHealth filed suit, seeking coverage for its payment to Brookhaven under its policy with Homeland.[3] After cross-motions for summary judgment, the district court granted summary judgment for Homeland, holding that eQHealth failed to actually *make* a claim to Homeland that would have triggered coverage under the Policy. eQHealth timely appealed.

## II.

A grant of summary judgment is reviewed "*de novo*, applying the same standard as the district court." *Colony Ins. Co. v. First Mercury Ins. Co.*, 88 F.4th 1100, 1106 (5th Cir. 2023) (citation omitted). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "On cross-motions for summary judgment, we

---

[3] eQHealth filed the operative, First Amended Complaint on February 1, 2022. eQHealth subsequently sought leave to file a Second Amended Complaint, which was denied on May 2, 2023.

review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Discover Prop. & Cas. Ins. Co. v. Blue Bell Creameries USA, Inc.*, 73 F.4th 322, 327 (5th Cir. 2023) (citation omitted).

Under Louisiana law, which the parties agree applies, "[a]n insurance policy is a contract between the parties and should be construed by using the general rules of interpretation of contracts set forth in the Louisiana Civil Code." *Richard v. Dolphin Drilling Ltd.*, 832 F.3d 246, 249 (5th Cir. 2016) (quoting *Cadwallader v. Allstate Ins. Co.*, 848 So. 2d 577, 580 (La. 2003) (internal quotation marks omitted)). "The parties' intent, as reflected by the words of the policy, determine[s] the extent of coverage." *Id.* (quoting *Reynolds v. Select Props., Ltd.*, 634 So. 2d 1180, 1183 (La. 1994)).

The insured must first "prove that its loss is covered by the policy"; if this burden is met, the insurer then has the burden of proving the applicability of policy exclusions. *Maldonado v. Kiewit Louisiana Co.*, 2013-0756 (La. App. 1 Cir. 3/24/14); 146 So. 3d 210, 218 (citations omitted). Although "an insurer has the right to limit coverage in any manner it desires, unless those limitations conflict with law or public policy," *Cent. Crude, Inc. v. Liberty Mut. Ins. Co.*, 51 F.4th 648, 653 (5th Cir. 2022) (citing *Elliott v. Cont'l Cas. Co.*, 949 So. 2d 1247, 1254 (La. 2007)), as "the purpose of liability insurance is to afford the insured protection from damage claims, policies should be construed to effect, and not to deny coverage," *id.* (citing *Yount v. Maisano*, 627 So. 2d 148, 151 (La. 1993)).

## III.

The district court granted summary judgment to Homeland solely on the ground that eQHealth had failed to make a claim as required by the policy. Upon a review of the parties' communications in conjunction with the text of the Policy, it is somewhat debatable whether eQHealth made a claim. That

does not, however, disturb the ultimate conclusion that no coverage exists for the claims eQHealth asserts: Even assuming *arguendo* that eQHealth's communications furnished the requisite notification to Homeland, we hold that the exception for coverage contained in Section IV(C) for payments made without Homeland's prior consent bars any recovery by eQHealth.

### A.

Section IV of the Policy, entitled "How Claims Will Be Handled," establishes that Homeland will "have the right and duty to defend any covered Claim," and "have the right to investigate, direct the defense, and conduct negotiations and . . . enter into a settlement of any Claim." Most importantly, in Section IV(C), the Policy also states: "You will not, except at your own cost, incur any expense, make any payment, admit any liability, assume any obligation, or settle any Claim without our prior written consent, and no coverage will be available under this Policy for any such settlement, expense, payment, liability, or obligation." Taken together, these provisions illustrate that the Policy sought to preserve Homeland's ability to oversee the handling and payment of any claims made against eQHealth for which it would otherwise owe coverage under the Policy.

### B.

On May 16, 2019, approximately two weeks after Brookhaven first received notice of the B.N. matter, eQHealth's CEO spoke with the then-director of AHCA and relevant counsel. During these negotiations, eQHealth's CEO wrote in an internal email that he "accepted liability on the part of eQHealth for the initial authorization [for B.N.'s care], but believe[d] that the time period after the initial authorization is negotiable, since AHCA played a role." Accordingly, eQHealth's counsel sent AHCA's counsel an email stating that he was "authorized to finalize arrangements for a payment to AHCA for $262,500"—provided "that amount is a hard cap on

[eQHealth's] liability, and conditioned on (and payable upon) an executed settlement agreement with Brookhaven releasing [eQHealth] from any additional liability, suits, etc."

eQHealth, AHCA, and Brookhaven continued their settlement negotiations through June. On June 3, 2019, AHCA advised eQHealth that there would be a call on which "AHCA would be presenting Brookhaven with a proposal for settlement by which eQHealth would pay Brookhaven $262,500." On June 11, 2019, eQHealth received a draft settlement agreement "with the invitation to add eQHealth as a named party." Because eQHealth felt it "had virtually no choice but to settle"—or else face a suit by Brookhaven—it agreed. Brookhaven signed the settlement agreement on August 28, 2019. And, on September 20, 2019, when all parties had signed, eQHealth paid Brookhaven $262,500.

eQHealth has not shown that it alerted Homeland about these developments before it signed the agreement. In fact, "eQHealth did not inform Homeland of settlement negotiations or of the settlement until December 12, 2019, when it made another demand for coverage."

## C.

As the timeline above indicates, Homeland was not notified of the circumstances until well after eQHealth had both agreed to *and* paid the settlement with AHCA and Brookhaven. That violated Section IV(C).

eQHealth's arguments to the contrary are not persuasive. eQHealth first argues that it was not bound by Section IV's consent requirement because Homeland had already improperly denied coverage. More specifically, eQHealth points out that although it agreed to settle on May 16, 2019, Brookhaven only signed the settlement agreement (and provided a release of liability) on August 28, 2019. The settlement, which was expressly "conditional and effective only upon Brookhaven's execution of a written

agreement," thus "became effective" on August 28, 2019, *after* Homeland denied coverage on June 21, 2019. Therefore, it is argued, under Louisiana law that an insured is not bound by policy provisions requiring the insurer's consent if the insurer improperly denies coverage, eQHealth no longer required Homeland's consent.

But the parties do not seem to have intended that eQHealth could keep Homeland out of the loop during negotiations and then present a final settlement to Homeland as a fait accompli. To the contrary, Section IV(C) prevents eQHealth from "settl[ing] any Claim without [Homeland's] prior written consent." The language in the provision is robust, preventing eQHealth in addition to this direct prohibition on settlements from "incur[ring] any expense, mak[ing] any payment, admit[ting] any liability," or "assum[ing] any obligation." Yet eQHealth instead unilaterally negotiated the settlement without affording Homeland a chance to respond—before June 21, even assuming eQHealth's interpretation of events.

Section IV(A) further provides that Homeland had the right under the Policy to "conduct negotiations" related to "settlement of any Claim." Whether or not this right was intended to be exclusive, it provides more evidence that the parties did not contemplate that the consent required under Section IV(C) would allow eQHealth to spend months negotiating a settlement without apprising Homeland, only to turn around and ask for remuneration after the fact.

eQHealth had already agreed to settle and negotiated the settlement by the time that it supposedly gave Homeland notice of the claim on June 17, 2019. And even when eQHealth sent its June 17, 2019, alleged notice of a claim, there is no evidence that it said anything about its extensive previous settlement negotiations—much less the already-negotiated settlement amount of $262,500. eQHealth also signed and paid the settlement prior to

notifying Homeland, without giving Homeland an opportunity to consent. All of this was contrary to Section IV.

eQHealth further argues that Section IV(C) contemplates a payment made in settlement of a claim—and as "Homeland has steadfastly argued that no claim was ever made," it "should [thus] be precluded from relying on the clause." This estoppel argument flies in the face of alternative pleading. *See* Fed. R. Civ. P. 8(d)(3) ("*Inconsistent Claims or Defenses.* A party may state as many separate claims or defenses as it has, regardless of consistency."). Moreover, the argument is not supported by the Policy's text. Section IV(C) also prohibits Homeland's payment for any cost that would result should eQHealth "admit any liability" or "assume any obligation," neither of which are necessarily predicated on a claim.

## IV.

The district court's judgment is AFFIRMED.

No. 23-30528

Andrew S. Oldham, *Circuit Judge*, joined by Willett, *Circuit Judge*, concurring in part:

I concur in my colleague's excellent opinion. I write separately to highlight an additional basis for affirmance. eQHealth entered a settlement agreement without Homeland's prior written consent. This violated the insurance policy's consent-to-settle clause.

In response, eQHealth argues that clause was not binding because Homeland denied coverage before the settlement was effective. Not so. On June 21, 2019, Homeland simply communicated that "no Claim" had yet been made on eQHealth. ROA.1370. This assessment made sense. After all, Brookhaven's demand letter—eQHealth's primary evidence of a claim—was not addressed or sent to eQHealth and only threatened suit "against the State of Florida." ROA.1371. So Homeland did not deny a claim but reasonably treated eQHealth's June 2019 correspondence as notice of a potential future claim. If a claim were made on eQHealth in the future and reported to Homeland, Homeland emphasized it would "review the Claim for coverage." ROA.1372. But instead of waiting to do so, eQHealth unilaterally settled. eQHealth, therefore, cannot escape the insurance policy's requirements.